## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**PARNELL R. MAY**                                                    **PLAINTIFF**
**ADC #153557**

**v.**                            **No: 4:21-cv-00255-LPR-PSH**

**KAWHUN TIMS,** *et al.*                                  **DEFENDANTS**

## PROPOSED FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following Recommendation has been sent to United States District Judge Lee P. Rudofsky. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

Plaintiff Parnell R. May filed a *pro se* complaint on April 1, 2021, while incarcerated at the Pulaski County Regional Detention Facility ("PCRDF") (Doc. No. 2). May subsequently filed two supplements to his complaint (Doc. Nos. 6-7). May alleges that on March 20, 2021, he made a complaint under the Prison Rape Elimination Act ("PREA") against defendant Deputy Kawhun Tims. Doc. No. 2 at

2-8.  May claims that Tims sexually harassed him by making sexually derogatory comments and unwelcome gestures.  *Id.* at 6-8.  May further claims that Tims used excessive force against him on March 21, 2021, causing injury to his left leg and back, in retaliation for the PREA complaint.  *Id.*  May also asserts that Sergeant Jawaski Conners ignored May's requests for help when Tims used excessive force.  *Id.* at 2-8.

May also claims that he made multiple requests for treatment of his injuries over a period of five days, but was denied treatment by Nurse Lowe and/or the acting charge nurse.[1]  *Id.* at 9.  After the Court screened May's complaint, as supplemented, the following claims were allowed to proceed:  May's individual capacity retaliation and excessive force claims against Deputy Tims; May's individual capacity failure-to-protect claim against Sergeant Connors; and May's individual capacity deliberate indifference claims against LPN Lowe and an unnamed nurse.  Doc. Nos. 9 & 13.

Before the Court is a motion for summary judgment, brief-in-support, and statement of facts filed by Tims and Connors (Doc. Nos. 79-81).  May filed a response, statement of facts, and an affidavit (Doc. Nos. 86-88).  Also before the Court is a motion for summary judgment, brief-in-support, and statement of facts filed by Lowe (Doc. Nos. 89-91).  May moved to have his pleadings filed in response

---

[1] May's claims against the acting charge nurse were dismissed for lack of service after he did not timely name her.  *See* Doc. Nos. 48 & 78.

to Tims' and Connor's motion for summary judgment considered as his responsive pleadings to Lowe's motion (Doc. No. 93). The Court granted that motion (Doc. No. 94). The Court notes that May failed to specifically controvert most of the defendants' asserted facts in his statement of disputed facts; accordingly, defendants' uncontroverted facts are deemed admitted. *See* Local Rule 56.1(c). Because the defendants' statements of facts, and the other pleadings and exhibits in the record, establish that they are entitled to judgment as a matter of law, the undersigned recommends that the defendants' motions for summary judgment be granted.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in

his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted).

An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". Fed. R. Civ. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

In *Reed v. City of St. Charles, Mo.*, 561 F.3d 788 (8th Cir. 2009), the Eighth Circuit Court of Appeals discussed the requirement that facts be viewed in the light most favorable to the non-moving party when considering a motion for summary judgment. The Court stated, "[i]f 'opposing parties tell two different stories,' the court must review the record, determine which facts are material and genuinely

disputed, and then view those facts in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them." *Id.* at 790 (*quoting Scott v. Harris*, 550 U.S. 372, 380 (2007)).

### III. Facts[2]

On December 26, 2019, Plaintiff Parnell Robert May was booked into the PCRDF on a 1st degree murder charge. Doc. No. 81-2, *May's Arrest and Booking*, at 1. On November 1, 2021, May was released to the custody of the Arkansas Department of Corrections. *Id.* at 2.

### March 20, 2021 PREA Complaint

On March 20, 2021, May, submitted a PREA complaint, stating:

The emergency call devices in the cell 415 does not work so as to call for emergency, whereas, on or about the date of 03/20th/2021 at around or about 5:30 PM, that Saturday, evening Deputy Tims did make a direct repeatedly unwelcome comment of a sexual nature, that did include a demeaning reference to gender sexually derogatory comments, about a sexual nature, against me, when the deputy Tims, was at the cell door of room 415, where that we both had engaged into a disagreement about my break, where that I told him, I did not deny my break, I never spoked [sic] to him that morning, and that the only time I would turn my break down, is for food and that he was a being to me, etc, etc, which led to the Deputy Tims eventually telling me directly, "you act like you would suck a dick for food" and that "I probably was tricking for crack," and I told Deputy Tims, that what he

---

[2] These facts are taken from the defendants' statements of facts (Doc. Nos. 81 & 90), and the documents and records attached to the defendants' motions for summary judgment, including relevant video of the incident in question. Disputed facts are noted.

said was illegal and that I got this much understanding, to report you, in for a sexual harassment, because you are supposed to be of professional standards, and that, he was not permitted by law, to make any repeated and/or unwelcome comments or gestures of a sexual nature, against me in the accordance with the PREA law.

I hollered aloud to the Deputy Tims to call his watch commander and/or supervisor, right now, I wish to file a PREA complaint immediately, because, the Deputy Tims is clearly a threat by a sexual nature against I Parnell May, while I am pre-trial detainee under such a sexually dangerous jailer [sic], who has the ability to open my food tray and contaminate it, with his fluids, for his personal pleasures or even specifically select my food tray for malicious purposes or contaminate the outer exterior of the food tray, to be served to me, Deputy Tims, did not call any of the supervisors, or watch commander, and left his shift at 6:00 PM, that aforementioned day, without reporting to any of the supervisors or responsible authorities, about my request to file PREA charge against deputy Tims because Deputy Tims, knew that he was wrong, and guilty for inflicting sexual harassment against me on 03/20/2021 at around 5:30 PM.

Doc. No. 81-6, *PREA Complaint*, at 1.  According to incident reports prepared by

other officers, May told Deputy Cody Smith about his PREA complaint, and Smith

informed his supervisor, Sergeant Evans.  Doc. No. 81-5, *Incident Reports*, at 1.

Sergeants Bilbruck and Evans then spoke to May regarding his complaint.  *Id.* at 2.

Defendant Kawhun Tims submitted an affidavit explaining that he is a Deputy

employed by the PCRDF.  Doc. No. 81-8, *Affidavit of Deputy Kawhun Tims*, at ¶1.

He stated that he and May discussed a missed break on March 20, 2021, and that on

the morning of March 21, 2021, Deputy Stovall informed him that May had filed a

PREA Complaint against him.  *Id.* at ¶¶ 2-3.  Tims did not receive a copy of May's

complaint until April 26, 2021.  *Id.* at ¶ 12.  He then completed the following Official

Memorandum to the PREA Coordinator, stating:

> During feeding time, Inmate May, Parnell called me to his cell about his one-hour break at approximately 1737 hours. I told the inmate that it got very busy in the unit, and I forgot about his break, I then proceeded to apologize to Inmate May for the mix-up.  In response the inmate intended to be very respectful.  I never had a verbal exchange or argument with Inmate May.  We did not have any problems after that. I was at his door for no more than 15 seconds.  Nothing further to report.

Doc. No. 81-6, *PREA Complaint*, page 5.

A Video of the March 20, 2021 interaction between May and Deputy Tims shows Tims approaching May's cell at 17:37:45, speaking with May, and then walking away at 17:38:03.  Doc. No. 81-7, *Video Footage*.

## **March 21, 2021 Incident**

Video footage taken on March 21, 2021 captures the incident about which May complains in this action.  That footage, in T-unit 2f rear sub-day at time stamp 11:07:27.981 shows Tims approaching May's cell with a food cart.  Doc. No. 81-7, *Video Footage*.  Tims opens the food port in the cell door, then walks back to the cart to pick up a food tray to pass through the port.  At this time, May places his lower leg through the food port.  Between 11:07:49.340 and 11:12:03.960, Tims attempts to push May's leg back through the food port.  May clearly does not cooperate, and fights Tims' efforts.  Tims then opens the cell door at 11:12:24.735. When the cell door is opened, May wraps his arm around the outside of the door and hangs onto the door, with his lower leg still protruding through the food port.  Tims

attempts to remove May's hand from the door. At 11:13:04.344, Tims is able to remove May's arm from the door and holds May's arms behind his back while still trying to remove May's leg from the food port.

Tims turns on his body camera, which is timestamped at 16:12:45.[3] His body camera contains audio. The body camera footage shows that, beginning at 16:13:29, Tims asks May numerous times to go back into the cell and states concern that May is going to hurt his leg. Tims continues to refuse to comply and to fight against Tims' efforts. At 16:13:31, May yells that he wants Tims to call a supervisor so that he can file a PREA complaint against Tims. Despite Tims' efforts, May is able to grasp onto the port with his arms, with his leg still protruding. May continues yelling for Tims to call a supervisor so that he can file a PREA complaint and an excessive force complaint. It is notable that the audio reflects that Tims remained calm and professional in his efforts to have May remove his leg from the food port. He did not raise his voice or exhibit any anger.

At 11:16:16.611, Tims is finally able to remove May from the food port and cell door, and May scoots away from Tims and away from his cell. Tims attempts to coax May back into his cell by saying "C'mon, I need you out of the trap" repeatedly. May refuses to comply. Tims then closes and locks the food port, and

---

[3] The footage from Tims' body-worn camera reflects a different time than the hall camera footage, but clearly shows the same incident.

May scoots to the other side of a glass wall.  May continues to yell for Tims to call his supervisor so that he can file a charge against him.  Tims struggles with May, but does not apply force.  At 16:18:02, Tims radios for assistance.  At 16:18:53, additional PCRDF personnel respond to the Unit to assist Tims, including Sergeant Connors. May then complies with orders to return to his cell, yelling that he needs protection from Tims.  At the conclusion of the body camera footage, Connors states that he is going to talk to Tims.  The rear sub-day camera shows that May was back in his cell at 11:19, after which PCRDF personnel are shown outside of May's cell speaking with one another.

Tims completed an incident report on the same day, stating:

> During feeding I attempted to serve inmate May, Parnell (22568-16) and he stuck his leg out of the food port. I gave Inmate Parnell three direct orders to put his leg back in the food port. He stated that he needed to talk to a Sergeant.  I attempted to push his leg back through the food port by placing my hands on his leg by pushing forward.  He used force by moving his leg towards me.  I opened the inmate's door to get his leg out at the food port.  I attempted to take his leg out of the food port by placing my hand on his upper shoulders and pulling him away out the food trap.  As I got him half way out of the trap, he continued to hold onto the door causing himself to be upside down.  As I secured his food port he crawled out of the cell and out of the upper back sub day area.  I instructed Inmate May to go back to his cell which he didn't comply.  Sergeants Conners and Ezell arrived along with Deputy Middleton to help walk inmate May back to his cell.  Medical personnel arrived to the unit, assessed and cleared Inmate May to remain in the unit.  Nothing further to report.

Doc. No. 81-5, *Incident Reports*, at 4; *see also* Doc. No. 81-8, *Affidavit of Deputy Kawhun Tims*, at ¶¶ 4-10 (providing same account).  In his affidavit, Tims claimed

that his efforts to remove May's leg from the food port were not in retaliation for May's filing a PREA Complaint against him. *Id.* at ¶ 11.

Defendant Connors, a Sergeant employed by the PCRDF, provided an affidavit describing what he witnessed on March 21, 2021. Doc. No. 81-9, *Affidavit of Sergeant Jawaski Connors,* at ¶ 1. He stated that on that date, he arrived to the T-Unit and observed May crawling out of the upper sub-day area and sitting on the floor of T-Unit. *Id.* at ¶ 2-3. According to Connors, May asked him to "keep Deputy Tims away from [him]." *Id.* at ¶ 4. Connors stated that May returned to his cell after being ordered to do so, and Connors secured him in his cell without incident. *Id.* at ¶¶ 5-6; *see also* Doc. No. 81-5, *Incident Reports,* at 5 (Connors' April 30, 2021 Supplemental Report providing same account). Connors stated that he does not recall May stating that he was injured and he did not appear to be injured, but medical personnel responded to the scene in accordance with protocol. Doc. No. 81-9, *Affidavit of Sergeant Jawaski Connors,* at ¶ 7. Connors stated he was there for approximately 10 minutes at most. *Id.* at ¶ 8. He stated he did not observe Tims use excessive force against May on March 21, 2021, and had no knowledge that May had filed a PREA Complaint against Tims. *Id.* at ¶¶ 9-10.

On March 21, 2021, May submitted a standard grievance, stating:

I was sexual [sic] harassed by deputy tims on the date 03/20/2021 i tried to reported [sic] it but he denied me access to any superior rank officers and the next day showed up at work around me when he should not been around me I protest and asked him to call his superior but he

refused and began to infict [sic] exessive [sic] unnecessary force against me it is on camra [sic] I want to press criminal charge against deputy tims now.

Doc. No. 81-3, *Requests and Grievances*, at 1. May submitted five additional grievances complaining about Tims' alleged sexual harassment on March 20, and his alleged retaliation and excessive force on March 21. *Id.* at 2-4 & 7. He also submitted an investigation tip line describing the same incident and his March 20 PREA complaint. *Id.* at 8.

## Resolution of May's March 20 PREA Complaint

On April 26, 2021, Sergeant D. Musaddiq wrote to Chief Deputy Hendricks, via chain of command, an official memorandum regarding May's PREA complaint, stating:

> On Saturday, March 20, 2021, Inmate May, Parnell reported to night shift personnel Deputy Cody Smith of a possible PREA violation. Sergeant Evans and Sergeant Bilbruck was [sic] in receipt of Offence/Incident Report DI2021-08479 written by Deputy Smith. Inmate May reported on Saturday, March 20, 2021 at approximately 1737 hours, that Deputy Tims, Kawhun #4881 made repeated and unwelcomed remarks of a sexual nature towards him. Specifically, Inmate May stated that Deputy Tims told him that, "you look like you suck dick for food, and that you trick for crack." Inmate May also states that he asked Deputy Tims to call his supervisor so he could report him per PREA complaint, but was never given a chance to report it. After Deputy Tims was relieved by Deputy Cody Smith (shift change, 1911 hours), Inmate May made a PREA complaint to the oncoming deputy.

> On Sunday, March 21, 2021, Inmate May was involved in another altercation with Deputy Tims which involved Inmate May sticking his leg out the food trap during lunch feeding. Deputy Tim's [sic] attempted to get Inmate May to remove his leg out of the trap by verbal

command and by trying to put his leg back thru [sic] the trap physically. Deputy Tims opened the cell door, and Inmate May ran out of the sub-day and sat down right outside the sub-day door in protest. Deputy Tims had to eventually call for assistance from supervisors (Sergeant Connors and Ezell). Upon his supervisors arriving, Inmate May was walked back to his cell on his own without no further incident. Deputy Tims was reassigned to U-unit for the rest of the rotation because of this incident, and because of the accusations levied against him by Inmate May.

On Monday, April 26, 2021, I (Sergeant Musaddiq) conducted an initial interview digitally recorded for this complaint. On Saturday, March 20, 2020 [sic] Inmate May, Parnell submitted a written statement that was lengthy in nature about complaints he had against Deputy Tims. The main PREA complaint was in reference to a verbal disagreement or conversation Inmate May and Deputy Tims engaged in at cell 415 at approximately 1737 hours. Inmate May was upset about not receiving his 1 hour break. Inmate May called Deputy Tims to the cell door to inquire about the missed break. Both Inmate May and Deputy Tims both agreed that they had a conversation about the missed break, however, Inmate May insisted that an argument ensued between the two which led to the unwelcome comments. Deputy Tims stated that the exchange between the two was polite and respectful and that he was only at his cell door for 15 seconds. Deputy Tims stated that he accidently forgot his break and apologized to Inmate May, but he thought Deputy Tims was lying to him. Also in the complaint, Inmate May stated that he didn't want Deputy Tims to feed him because he would open his tray and contaminate his food with his bodily fluids for his personal pleasure. Video footage collaborates the fact that Deputy Tims acknowledged Inmate Parnell and did have a verbal exchange which didn't appear to be hostile. Deputy Tims is seen at Inmate May's cell doors for 12-15 seconds, and then appears to walk to the water closest to flush toilets. The brief encounter doesn't appear to be an argument. Deputy Tims is seen continuing on with his duties.

On Sunday, March 21, 2021 at approximately 1107 hours, Deputy Tims attempted to serve Inmate May his food tray. Deputy Tims opened the food trap, and Inmate May stuck his whole leg out of the trap. Deputy Tims attempted to put his leg back in the food trap by both verbal command and physically. Deputy Body Cam footage was submitted

with this report that showed Deputy Tims attempting to put Inmate May's foot back thru [sic] the food trap. Deputy Tims demeanor during this altercation was somewhat controlled and he tried to handle Inmate May respectfully.  Deputy Tims can be heard many times begging Inmate May to put his foot back in the trap. When Deputy Tims tried to put his leg back in the trap, he can be heard telling Inmate May that he wasn't trying to hurt him. It appears that Inmate May was attempting to get his way in getting other personnel down to the unit to respond to his request to get Deputy Tims removed from T-unit. I explained to Deputy Tims that the incident was a teachable moment and that he spent too much time dealing with Inmate May. Deputy Tims stated his supervisors (sergeant Connors and Ezell) that day also agreed that he should have called for help sooner. Sergeant Connors and Ezell were called by Deputy Tims via radio, and assisted in getting Inmate May back to his cell without further incident. During Inmate May's recorded interview, he stated he did not want Deputy Tims to be fired, but wanted him retrained in respectful behavior and not be allowed around him in the future. Inmate May's interview went on for 59 minutes total.

On Tuesday, April 13, 2021. Inmate May addressed another complaint via Chief Deputy Charles Hendricks. Inmate May insisted on filing an additional PREA complaint on Deputy Tims through the nurse assigned to pill call (Nurse Whitney). Deputy Tims responded through memo about this complaint. Deputy Tims informed Nurse Whitney that he wasn't comfortable opening the food trap for Inmate May due to an incident of Inmate May placing his whole leg out of the trap 3 weeks prior.  Deputy Tims was in the unit only to break Deputy Gleason for an hour and asked the nurse to come back.

In conclusion, after review of all documents, deputy body cam and unit video footage, I find this incident involved an inmate forming a preconceived notion about mistreatment (not getting a break). During every face to face interaction between both Deputy Tims and Inmate May, Deputy Tims appears to have conducted himself in a reasonable manner per the video.  Deputy Tims was removed from working in T-unit a day after the 2nd altercation with Inmate May due to the PREA allegations levied against him. However due to not having enough evidence of this conversation ever taken place, I find this allegation **Unfounded** (an allegation which produced insufficient evidence to make a final determination of a substantiated or unfounded claim).

> Since there was no physical contact or assault involved, I recommend
> this case be closed.

Doc. No. 81-6, *PREA Complaint*, at 2-3.

On May 10, 2021, Sergeant Connors completed an Official Memorandum to

Lieutenant Atwood regarding alleged sexual comments, stating:

> On March 21, 2021, while dealing with Inmate May, Parnell (22568-
> 16) in T-unit, he never said anything about Deputy Tims making a
> sexual comment. He was trying to explain to me that Deputy Tims
> didn't give him a hour break and he wanted to speak with a Sergeant.

Doc. No. 81-6, *PREA Complaint*, at 4.   May disputes Connor's statement; he

maintains he told Connors about the "comments of a sexual nature" that he claims

Tims made to him on March 20, 2021.  *See* Doc. No. 87 at 5.

## **May's Medical Treatment at the PCRDF**

On March 21, 2021, the day of the incident with Tims, Nurse Stephanie

Schuller noted:

> During am pill call, Pt stated to nurse that he had his leg thru the trap
> door & deputy put his leg back in thru the door trap & had to turn his
> foot in order to get it back in. Pt also stated that deputy sexually
> harassed him. Nurse left to get Charge Nurse. Nurses returned to unit
> where pt showed nurses leg-small lacerations noted c/o aching pain.
> Charge nurse went to confirm that the harassment is being address by
> Srgnt. Calvin, which it is.  Ibuprofen will be given to help with pain.

Doc. No. 89-4, *May's PCDRF Medical Records*, at 107.

On March 23, 2021, at 9:23 p.m., May submitted a Sick Call Request stating

"I have been injured my left leg and back had been injured by deputy tims use of

excessive unnecessary force and I have not received any medical care."  *Id.* at 98. This Sick Call Request was received by Medical the next day, and Nurse LeToree Jackson scheduled May for Nurse Sick Call on March 26, 2021.  *Id.* at 97-98.

On March 24, 2021, Dr. Absalom Tilley prescribed May a seven-day prescription of Ibuprofen two tablets by mouth twice daily.  *Id.* at 37-38.  On March 26, 2021, at 2:25 p.m., Nurse Briana Bush performed Segregation Rounds on May, and he did not request any Medical Services at that time.  *Id.* at 11-12.  On March 27, 2021, at 3:57 a.m., Nurse Collins Meangwe saw May in Nurse Sick Call for his complaints of new onset of back pain.  *Id.* at 12, 98.  During this Sick Call visit, May was given a prescription for acetaminophen 325 mg two tablets by mouth twice daily for seven days.  *Id.* at 12, 38.

On March 28, 2021, May reported to Nurse Christina Whitney that his ibuprofen and Tylenol were not helping his pain, and Nurse Whitney scheduled May for a Sick Call appointment on March 29, 2021.  *Id.* at 98-99.  On March 29, 2021, Nurse Practitioner Cobb prescribed May methocarbamol ("Robaxin") 750 mg one tablet by mouth twice daily.  *Id.* at 39.  May's prescription methocarbamol was received from the pharmacy on March 30, 2021.  *Id.* at 107.

May filed this lawsuit on April 1, 2021.  Doc. No. 2.  He continued to submit grievances and sick call requests concerning his left leg and back injuries.  Doc. No. 81-3, *Requests and Grievances*, at 5-6; Doc. No. 89-3, *May's Medical Sick Calls,* at

3; Doc. No. 89-4, *May's PCDRF Medical Records* at 13, 99, 101-103. He continued to receive pain medications and treatment for his complaints. Doc. No. 89-4, *May's PCDRF Medical Records*, at 13-14, 16, 24, 29-33, 39-40, 42-45, 47; Doc. No. 89-6, *Keep on Person Agreement* (regarding knee brace). May's Medication Administration Record indicates that May consistently received his prescribed pain medications from March 25, 2021, through November 1, 2021, with very few exceptions. Doc. No. 89-4, *May's PCDRF Medical Records*, at 50-90.

### Affidavit of Bertha Lowe

Bertha Lowe was employed by Turn Key Health Clinics, LLC[4] as Administrative Assistant until March 17, 2021, when she was promoted to Health Services Administrator. Doc. No. 89-2, *Lowe Affidavit*, at ¶¶ 1-2. Lowe is not a health professional and does not provide patient care to any inmates, including May. *Id.* at ¶¶ 3-6. Lowe has never had any personal involvement in medical decision-making as to May. *Id.* at ¶ 7. Lowe's only involvement related to May's claims was when she reported to Michael Hagerty, in response to a grievance submitted by May on April 2, 2021, that May had been seen by medical personnel for his back pain complaints on March 27 and April 16, 2021. *Id.* at ¶¶ 1-13; Doc. No. 89-5 at 42. According to Lowe, she has never denied or delayed May's access to medical care

---

[4] The Pulaski County Sheriff's Office contracts with Turn Key Health Clinics, LLC ("Turn Key") to provide medical care and treatment to inmates incarcerated at the PCRDC. Doc. No. 89-1, *Contract.*

and has never observed any other Turn Key provider who denied or delayed May's access to medical care. *Id.* at ¶¶ 8-9.

## IV. Analysis

### A. *Defendants Tims & Connors*

Defendants Tims and Connors argue that they are entitled to qualified immunity with respect to May's claims because no constitutional violation has occurred.[5]  The Court agrees for the reasons described below.

#### 1. Defendant Tims – Retaliation

To succeed on a First Amendment § 1983 retaliation claim, a plaintiff must prove: (1) that he engaged in a protected activity; (2) that the government official took adverse action against him that would chill a person of ordinary firmness from continuing the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity. *Gonzalez v. Bendt*, 971 F.3d 742, 745 (8th Cir. 2020); *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013).  Speculative

---

[5] Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015).  Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

and conclusory, or *de minimis* allegations cannot support a retaliation claim. *See Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir. 1996) (per curiam). A plaintiff must also prove a causal connection between the constitutionally protected activity and the adverse action. *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004). Temporal proximity between a protected activity and an adverse action "is relevant but not dispositive." *Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006) (citing *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir. 1999)). To succeed on a retaliation claim, a plaintiff must also provide affirmative evidence of a retaliatory motive. *See Haynes v. Stephenson,* 588 F.3d 1152, 1157 (8th Cir. 2009); *see also Wilson*, 441 F.3d at 592 ("[Plaintiff's] belief that [defendant] acted from a retaliatory motive is insufficient.").

May claims that Tims' actions on March 21 were motivated by the PREA complaint May lodged against Tims the day before. Doc. No. 2 at 2-8. Tims acknowledges that he was made aware of the PREA complaint that morning. *See* Doc. No. 81-8 at ¶ 3. The filing of a prison grievance, such as a PREA complaint, constitutes protected activity. *See Haynes v. Stephenson*, 588 F.3d 1152, 1155–56 (8th Cir. 2009). While the PREA complaint and the March 21 incident were close in time, such proximity, without more, is insufficient to establish that Tims' actions on March 21 were retaliatory. And while May believes that Tims acted with a retaliatory motive, he has offered no affirmative evidence of such a motive. Instead,

the evidence of record reflects that May instigated the March 21 incident by placing his leg through the food trap.  He refused to comply with orders to remove his leg and fought against Tims' efforts to do so.  Tims' calm demeanor and temperament and his statements to May do not evidence a retaliatory motive.

Finally, the actions May alleges Tims took – pushing his leg back into his cell and refusing to call his supervisor – are not the sort of adverse actions that would chill a person of ordinary firmness from continuing to exercise his First Amendment rights.  "The ordinary-firmness test is designed to weed out trivial matters from substantial violations of the First Amendment."  *Gonzalez*, 971 F.3d at 744 (citing *Santiago*, 707 at 992).  "'The test is an objective one, not subjective. The question is.... [w]hat would a person of 'ordinary firmness' have done in reaction to the [adverse action]?'" *Id.* (quoting *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003)).  While the test is an objective one, "how the plaintiff acted might be evidence of what a reasonable person would have done." *Garcia*, 348 F.3d at 729. *See Gonzalez*, 971 F.3d at 745 (considering plaintiff's actions in response to the alleged retaliation as evidence of what a person of ordinary firmness would have done and affirming grant of summary judgment); *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002) (noting that plaintiff continued to exercise her First Amendment rights despite the retaliatory acts of the defendants).  In this case, despite Tims' actions in trying to push May's leg back into his cell, May continued to

threaten to file a new PREA complaint against Tims and filed several grievances about the incident as well.

2. Defendant Tims – Excessive Force

Due process requires that a pre-trial detainee cannot be punished prior to an adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 537 (1979). To support a claim for relief, a plaintiff must allege and prove that the force purposely or knowingly used against him was objectively unreasonable, and objective reasonableness turns on the "facts and circumstances of each particular case." *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015). "Constitutionally infirm practices are those that are punitive in intent, those that are not rationally related to a legitimate purpose, or those that are rationally related but are excessive in light of their purpose." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

The Court has carefully reviewed the record, including the video recordings submitted as evidence, and finds that May's version of what happened on March 21, 2021, is blatantly contradicted by the evidence in the record. May claims that Tims "bended and twisted my left leg, and physically striking pounded my back very hard repeatedly, and twisted, bended my hands and fingers while I held on to the door." Doc. No. 2 at 4. The video shows Tims calmly attempting to push May's leg back through the food port. Tims is heard repeatedly asking May to pull his leg out of the door and warning him that he will hurt himself. Tims' demeanor was calm and

reasonable.  May, however, refused to cooperate and pull his leg out of the trap door and repeatedly yelled at Tims.  What force Tims used in attempting to push May's leg back into the cell was necessitated by May's actions in putting his leg through the port in the first place and then refusing to pull it back out and fighting against Tims' efforts. Tims' actions were not objectively unreasonable.

In reviewing May's PREA complaints, Sergeant Musaddiq found Tims' actions to be reasonable, although he believed Tims could have called for help sooner.  This conclusion does not support May's claim that Tims used excessive force; rather, it merely shows that Tims could have handled the situation differently by asking for assistance sooner.  His failure to do so does not equate to punishment or the unconstitutional use of excessive force.

As stated above, if opposing parties tell two different stories, as is the case here, the Court is required to view genuinely disputed material facts in a light most favorable to the nonmoving party, **as long as** those facts are not so blatantly contradicted by the record that no reasonable jury could believe them.  The Court finds that the facts alleged by May are so blatantly contradicted by the record that no reasonable jury could believe them. The Court is therefore not required to view the facts in a light most favorable to May, and declines to adopt his version of the facts for purposes of ruling on this motion.  *See Boude v. City of Raymore*, 855 F.3d 930, 933 (8th Cir. 2017).  There was no constitutional violation, and Tims is

therefore entitled to qualified immunity.

### 3.  Connors – Failure-to-Protect

May alleges that during the March 21 incident with Tims, Conners "began to joke and condone to the Deputy Tims blatant actions of excessive use of unnecessary physical force against I, while I kept asking for medical assistance."[6]  Doc. No. 2 at 5.  However, the video shows that May had removed his leg from the food port and left his cell before Connors arrived.  Doc. No. 81-7.  Connors was not present while Tims attempted to coerce Tims to remove his leg from the food port.  Accordingly, even if Tims' actions in attempting to push May's leg back into his cell constituted excessive force, Connors could not be held liable for failing to intervene.  May's claims against Connors therefore fail as a matter of law and Connors is entitled to qualified immunity.

### B.  *Defendant Bertha Lowe*

May alleges that Lowe failed to ensure that he received adequate treatment for his complaints of knee and leg pain.[7]  However, the record shows Lowe's only

---

[6] As the Court previously noted (Doc. No. 9 at n. 1), such allegations are sufficient to state a claim for deliberate indifference.  *See Burgess v. Moore,* 39 F.3d 216, 218 (8th Cir. 1994) (supervisor present during alleged use of excessive force could be found to be deliberately indifferent for failure to intervene).

[7] To succeed with an inadequate medical care claim, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs.  *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997). This requires a two-part showing that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it.  *Id.; see also Farmer v. Brennan,*

involvement in May's care was responding to one grievance where she stated that he had been treated on two separate dates.   Participation in the administrative grievance procedure alone is insufficient to establish liability under § 1983.   *See Rowe v. Norris*, 198 F. App'x 579, 580 (8th Cir. 2006).   May must instead show that Lowe was made aware of a constitutional violation and, with deliberate indifference, failed to take corrective action or tacitly authorized the offending acts.   *See, e.g., Luckert v. Dodge Cty.,* 684 F.3d 808, 817 (8th Cir. 2012).

The record in this case shows that May received treatment for his complaints of leg and knee pain immediately after the incident.   On March 21, 2021, the day of the incident, he received the pain medication ibuprofen, and he was given a prescription for ibuprofen by Dr. Tilley a few days later.   He was seen in sick call on March 27 and given a prescription for acetaminophen.   When he reported those were not working, he was prescribed Methocarbamol.   There is simply no evidence to support his claim that he did not receive treatment for his complaints. Accordingly, no constitutional violation occurred warranting corrective action from

---

511 U.S. at 837; *Estelle v. Gamble,* 429 U.S. 97, 105 (1976).  Pretrial detainees' claims are evaluated under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment.  *See Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004). However, pretrial detainees are entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment.  *See id.* (citing *Spencer v. Knapheide Truck Equip. Co.,* 183 F.3d 902, 906 (8th Cir. 1999)); *see also Davis v. Hall,* 992 F.2d 151, 152–53 (8th Cir. 1993) (per curiam) (applying deliberate indifference standard to pretrial detainee's claims of inadequate medical care).

Lowe.  *See Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993) ("Moreover, [defendant] did not fail to take 'corrective action' for constitutional violations here because there were no predicate violations to correct in the first place.").  May's claims against Lowe fail as a matter of law.

## V.  Conclusion

The defendants' motions for summary judgment should be granted.  May's claims should be dismissed with prejudice.

IT IS SO RECOMMENDED this 22nd day of February, 2023.

_____
UNITED STATES MAGISTRATE JUDGE